**Maryam HARTOONI, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 92–70613.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 1994.

Decided April 7, 1994.

---

338

Ronald S. Sugarman, Beverly Hills, CA, for petitioner.

Karen A. Hunold, U.S. Dept. of Justice, Washington, DC, for respondent.

Before: PREGERSON, O'SCANNLAIN, and FERNANDEZ, Circuit Judges.

Opinion by Judge PREGERSON; Dissent by Judge O'SCANNLAIN.

PREGERSON, Circuit Judge:

## I. INTRODUCTION

Appellant, Maryam Hartooni, appeals the Board of Immigration Appeals ("Board") decision denying her application for asylum and withholding of deportation. We have jurisdiction under § 106(a) of the Immigration and Nationality Act, 8 U.S.C. § 1105a(a). Ms. Hartooni makes two claims of error. First, she claims that she was denied due process of law because her interpreter was incompetent. Second, she contends that the Board misapplied the criteria for eligibility for asylum to the facts of her case. We affirm on the first issue, and remand to the Board on the second.

## II. FACTS

Maryam Hartooni is a citizen of Iran and a practicing Armenian Christian. She accompanied her parents to the United States in August of 1984 after allegedly experiencing several disturbing incidents at the hands of the authorities in Iran. She entered this country on a three-month visitor's visa. Two months later her parents returned to Iran, but she remained behind after submitting an application for asylum.

Her asylum application mentioned no specific instances of persecution. She checked the "No" box in response to question 38 on the application, which asked whether she or anyone in her family had ever been mistreated by the authorities in her home country.

A State Department advisory letter developed in response to her asylum application recommended against asylum. The State Department letter acknowledged that Armenian Christians were *presumed* to have a well-founded fear of persecution in Iran, but concluded that the presumption did not apply to her case, largely because her parents had returned to Iran and had a business there.

Her asylum application was denied, and in April of 1986 the Immigration and Natural-

ization Service ("INS") issued an Order to Show Cause why she should not be deported. At her deportation hearing, she conceded deportability and renewed her application for asylum, or in the alternative, for withholding of deportation.

Ms. Hartooni requested the aid of an interpreter for the deportation hearing, and one was provided by the INS. The interpreter appears from the transcript to speak only broken English. In addition, the Immigration Law Judge ("ILJ") reprimanded the interpreter on a few occasions for "explaining" or discussing things in Armenian with Ms. Hartooni rather than simply interpreting.

In an oral decision, immediately after the hearing on February 2, 1987, the ILJ denied Ms. Hartooni's asylum application. The critical portion of the ILJ's decision stated that "[t]he cumulative effect of the respondent's testimony and application ... leads me to conclude that the respondent has not established a credible claim to persecution. The respondent asserts persecution and alleges persecution, but the facts she presents does not lead me to conclude that her claim is valid."

Affirming the ILJ's decision, the Board noted inconsistencies between Hartooni's application and her testimony and held that "the immigration judge found the respondent's testimony not credible and there is substantial evidence to support that determination." AR at 3.

## III. DISCUSSION

### A. *Competency of the Interpreter.*

■ Ms. Hartooni claims that she was denied a fair trial because her interpreter gave her advice about what to say instead of directly interpreting her words, and because the interpreter may have substituted the interpreter's answers for those given by Hartooni. We review alleged due process violations in deportation proceedings de novo. *Barraza Rivera v. INS*, 913 F.2d 1443 (9th Cir.1990).

■ A person who faces deportation is entitled under our constitution to a full and

fair deportation hearing. *Wong Yang Sung v. McGrath,* 339 U.S. 33, 49–50, 70 S.Ct. 445, 453–54, 94 L.Ed. 616 (1950). The right of a person facing deportation to participate meaningfully in the deportation proceedings by having them competently translated into a language he or she can understand is fundamental. *See Tejeda–Mata v. Immigration and Naturalization Service,* 626 F.2d 721 (9th Cir.1980) ("this court and others have repeatedly recognized the importance of an interpreter to the fundamental fairness of ... [a deportation] hearing if the alien cannot speak English fluently"), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2280, 73 L.Ed.2d 1291 (1982). *Accord Matter of Tomas,* 19 I & N Dec. 464 (BIA 1987).

■ Therefore, we must determine whether Ms. Hartooni's interpreter performed competently, and if not, whether her hearing was prejudiced by that failure. *See United States v. Nicholas–Armenta,* 763 F.2d 1089 (9th Cir.1985) (due process challenges to deportation proceedings require a showing of prejudice).

Our review is limited to the administrative record upon which the deportation order is based. 8 U.S.C. § 1105(a)(4). It would have been inappropriate for Hartooni's interpreter to have substituted the interpreter's words for those said by Ms. Hartooni. But we have no evidence properly before us that the interpreter did so.

Hartooni claims that her brother told her attorney after the hearing that the interpreter attempted to guide her testimony. But Ms. Hartooni's brief to the Board is the only place in the record where her allegation of coaching appears. The record also reveals a few instances wherein the ILJ reprimanded the interpreter for conversing with Hartooni rather than interpreting. But based solely on the record the interpreter appears to have heeded the ILJ's admonishments.

■ Even if the interpretation was incompetent, Hartooni must show that the incompetence prejudiced the outcome of her hearing. *Barraza Rivera,* 913 F.2d at 1448. "We find prejudice where an alien's rights are violated 'in a manner so as potentially to affect the outcome of the proceedings.'" *Id.*

Here Hartooni has alleged that her true words were not spoken by the interpreter, but has not indicated what, if anything, she would have said differently if given a chance. Because there is no evidence in this case of any specific *instance* where the interpreter is alleged to have erred, we cannot say that the interpretation influenced the outcome of the hearing.

### B. *Eligibility for Asylum*

#### (1) *Standard of Review:*

■ Ms. Hartooni claims that she was improperly denied asylum. We review the Board's decision, rather than that of the ILJ. *Castillo v. INS,* 951 F.2d 1117, 1120 (9th Cir.1991). The Board, in turn, has the power to review the ILJ's decision de novo, to make its own findings of fact and to determine for itself whether the evidence was sufficient. *Id.* Nevertheless, the ILJ's credibility findings are entitled to "considerable deference." *De Valle v. INS,* 901 F.2d 787, 792 (9th Cir.1990).

■ We review de novo purely legal questions regarding the requirements of the Immigration and Nationality Act (the "Act"). *Abedini v. INS,* 971 F.2d 188, 190 (9th Cir. 1992). By contrast, factual findings by the Board regarding asylum or withholding of deportation claims are "conclusive" if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4). We reverse such findings only where the evidence presented by the applicant would compel any reasonable factfinder to reach a contrary result. *INS v. Elias–Zacarias,* —— U.S. ——, ——, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992).

#### 2. *Statutory Scheme*

■ The Attorney General has discretion to grant asylum to any applicant who meets the threshold definition of a "refugee." 8 U.S.C. §§ 1101(a)(42), 1159(a). "Refugee" is statutorily defined as "any person who is outside any country of such person's nationality ... and is unable or unwilling to return to ... that country because of persecution or a well-founded fear of persecution on account

of race, religion, nationality, membership in a particular social group, or political opinion...." 8 U.S.C. § 1101(a)(42)(A). The "well-founded fear" requirement has both objective and subjective components. The subjective component may be satisfied by "an applicant's credible testimony that he genuinely fears persecution." *Acewicz v. INS,* 984 F.2d 1056, 1061 (9th Cir.1993). The objective component requires "credible, direct, and specific evidence of facts supporting a reasonable belief of fear of persecution." *Id.* (internal quotation marks omitted). "[C]onditions in the country of origin, its laws, and the experiences of others" are relevant factors in this determination. *Garcia–Ramos v. INS,* 775 F.2d 1370, 1374 (9th Cir.1985) (internal quotation marks omitted). In fact, under certain conditions, they can be dispositive. *See Hernandez–Ortiz v. INS,* 777 F.2d 509, 515–516 n. 3 (9th Cir.1985).

(3) *Evidence of a Well–Founded Fear of Persecution.*

 Iran is an Islamic Republic in which "[r]eligion is almost inseparable from government." *Country Reports on Human Rights Practices for 1992* 1002 (Washington, D.C. GPO, 1993) ("Country Reports"). It is a "major abuser of human rights." *Id.* at 999. Among those who have been singled out for mistreatment is the small community of Armenian Christians. *See* Letter from Edward H. Wilkinson, Dir., Office of Asylum Affairs, Bureau of Human Rights and Humanitarian Affairs, Dept. of State ("Human Right's Letter"), *reprinted in* 62 *Interpreter Releases* 1000 (1985).

At the time of Ms. Hartooni's application for political asylum, persecution of Christians in Iran had risen to such a level that the State Department was of the opinion that they should be granted asylum "unless otherwise ineligible." *Id.* Under the State Department policy, Christian Armenians, *"by virtue of their faith,* met the test of having a well-founded fear of persecution in Iran, within the meaning of the United Nations Convention and Protocol Relating to Refugees." *Id.* (emphasis added). That is, Christian Armenians were presumptively eligible for asylum.

In addition to evidence of general persecution of a protected group we generally require a petitioner to demonstrate "a specific inference of personal danger." *Hernandez–Ortiz,* 777 F.2d at 515–16. Ms. Hartooni testified that she attended an Armenian Christian school in Iran and that the school had been closed by the Iranian Government, apparently because it was "contrary to Islam." She also testified that she was among those forbidden by the Iranian authorities to celebrate Christmas, an important holiday for her. In addition, it is common for Iranian soldiers to stone the Christian churches while their members are inside. On one occasion, Iranian soldiers stoned Hartooni's church while *she* was inside. The soldiers who were throwing the stones came to the front door and two of them even walked into the church.

These purely religiously-directed incidents occurred within the general atmosphere created by the Iranian government at that time, and were accompanied by other specific incidents that were directed at or did directly affect her. We need not here decide whether these latter items were religious in character. Even if they were not, they added to her particular feelings of fear and exacerbated and punctuated the fears generated by the particularized attacks upon her religious practices. For example, on one occasion, the soldiers caught her with her hair outside of its "tie" and warned her that if they found her again she could be sent to prison. On another occasion she was standing with a group of girls, when the soldiers approached. The problem, again, appears to have been one of improperly bound hair, and some of the friends were "taken away" for a few days. She managed to run away and escape from the soldiers at that time. Finally, about two months before Hartooni came to the United States in 1984 she and her parents were frightened by a visit from some Iranian soldiers. The soldiers asked where her brothers were and were told that they had moved to the United States. Since that time, there have been other visitations by soldiers to ask after the children in the family, including her. It is, thus, apparent that the rather frightening power of the Iranian

state, which is not tolerant of Christians, has not only interfered with her religious practices, but has also taken particular notice of her.

These facts, if believed, are enough to satisfy the requirement of a personal connection to the general persecution suffered by Christian Armenians in Iran.

### (4) *The ILJ's Opinion:*

■ "The immigration judge is in the best position to make credibility findings because he sees the witness as the testimony is given." *Canjura–Flores v. INS*, 784 F.2d 885, 889 (9th Cir.1985). But the ILJ must have a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief. *Damaize–Job v. INS*, 787 F.2d 1332, 1338 (9th Cir.1986). Absent an explicit finding that a specific statement by the petitioner is not credible we are required to accept her testimony as true. *See id.* at 1337–38 (accepting as true all testimony by the petitioner other than that questioned by the ILJ).

■ In this case the ILJ failed to make clear findings about Hartooni's specific claims. The opinion put forth two separate general arguments, and then failed to explain which was dispositive of its conclusion that Hartooni did not have a well-founded fear of persecution.

First, the opinion described the evidence presented by Hartooni, focusing on the fact that her parents had little difficulty leaving Iran to come to the United States, and that when they returned to Iran they apparently encountered only minor difficulty with the Iranian authorities. This information about Hartooni's parents is hardly relevant to her *own* well-founded fear of persecution. Standing alone, this information would *not* have been sufficient evidence to defeat her claim, particularly in view of the acknowledged persecution of Armenian Christians, and the evidence that the general persecution had reached her as an individual.

The second part of the ILJ's opinion pointed out that Ms. Hartooni's testimony was contradicted by her having checked the "No" box in response to the question on the application regarding mistreatment by the authorities. As noted by the ILJ, this discrepancy was not explained by Hartooni (nor was it brought up by the INS at the hearing). Despite noting this contradiction, the ILJ did not expressly state that he did not believe Hartooni's testimony. Nor did he make any findings of fact regarding which, if any, of her specific claims were questionable.[1]

Rather, he said that "[t]he cumulative effect of the respondent's testimony and application leads me to conclude that the respondent has not established a credible claim to persecution. The respondent asserted persecution and alleged persecution, but the facts she presents does not lead me to conclude that her claim is valid." AR at 36. This statement is ambiguous. It does not tell us whether the basis of the decision is the ILJ's judgment of Hartooni's credibility or his determination that "the facts she presents" are not enough to establish a claim of persecution. It absolutely does not rise to the level of an explicit finding that any specific statement by Hartooni was not credible.

### (5) *The Board's decision:*

■ The Board's decision compounded the ILJ's error by wholly relying on nonexistent "findings" of the ILJ. As discussed above, the Board has the power to make its own findings of fact and it may also disagree with the immigration judge's credibility findings. *Cardoza–Fonseca v. INS*, 767 F.2d 1448, 1455 (9th Cir.1985), *aff'd*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Where the ILJ has not made previous findings, or where the basis for the ILJ's decision is not clear from the record, the Board becomes the *initial* factfinder. As the initial factfinder, it was required to apply the same standard that would have been required of the ILJ. *See Canjura–Flores v. INS*, 784

---

1. We note, however, that the sole basis for any such determination would be a single box checked on a complicated application form by a fourteen year old girl of limited English speaking ability. We note further that the ILJ's opinion fails to explain why the failure of the child to check the appropriate box is given any weight at all in view of the overwhelming evidence, including the Human Rights Letter, corroborating her claims.

F.2d at 888–89 (absent a specific finding by the ILJ or the Board we presume that the petitioner was credible).

The part of the Board's decision discussing its reasons for denying the asylum application was one paragraph long. That paragraph in its relevant part provided:

> Following our review of the record, we concur with the immigration judge's decision and find that the respondent failed to demonstrate a well-founded fear of persecution within the meaning of the Immigration and Nationality Act.... In the matter before us, *the immigration judge found the respondent's testimony not credible* and there is substantial evidence to support that determination. We specifically note the inconsistencies between the material contained in the [asylum application] and the testimony at the hearing. On appeal, the respondent fails to address the credibility finding but rather repeats the evidence placed before the immigration judge. This repetition fails to establish eligibility for relief.

AR at 3 (citations omitted).

This paragraph is patently wrong because the ILJ never made any such "credibility finding." The Board's references to "substantial evidence" were meaningless because the Board refers to evidence in support of a finding that was never made. Thus, the entire substance of the Board's stated reasons for failing to credit Hartooni amounted to a single check mark in the Asylum application filled out by a fourteen-year old girl with limited English proficiency.

We are not permitted to credit such an inaccurate, conclusory, and boilerplate decision. *See Castillo,* 951 F.2d at 1121 (9th Cir.1991) ("[I]n order for this court to conduct a proper substantial evidence review of the BIA's decision, the Board's opinion must state with sufficient particularity and clarity the reasons for denial of asylum"). The Board's decision was premised on a nonexistent credibility finding. It provided only one questionable reason for the denial. And it failed to explain why it discounted the compelling evidence corroborating Hartooni's story, including the State Department presumption that Armenian Christians in Iran had a well-founded fear of persecution "by virtue of their faith," and the fact that her school was closed by the fundamentalist regime. In view of these failures and of the compelling evidence in favor of Ms. Hartooni's claims, we hold that the Board's action was arbitrary and capricious.

■■■■■ The only remaining question is whether to remand or reverse the Board's failure to grant refugee status to Ms. Hartooni. We reverse where the record conclusively demonstrates that the petitioner had a well-founded fear of persecution. *See Aguilera–Cota v. INS,* 914 F.2d 1375, 1384 (9th Cir.1990). We also are required to accept a petitioner's testimony as true if neither the Board nor the ILJ has made specific credibility findings. *See Damaize–Job* at 1337–1338. The reason for this rule is that "[a]ny other rule would put us in the position of second-guessing the credibility of the petitioner on appeal when no doubts have been raised by the Immigration Judge or the Board." *Canjura–Flores,* 784 F.2d 885 (9th Cir.1985). Here, however, we cannot say that "no doubts have been raised" about Hartooni's credibility. We therefore remand to the Board so that it may make a determination of Hartooni's credibility in the first instance, and so that it also may make the ultimate determination of her eligibility for asylum in accordance with the principles set forth above.

**REMANDED.**

O'SCANNLAIN, Circuit Judge, dissenting:

While I believe that this is a close case, especially given the majority's admission that doubts have been raised about the petitioner's credibility, Majority Opinion at 343, I am persuaded that the immigration judge ("IJ") made implicit findings concerning the petitioner's credibility. Because these findings are entitled to "considerable deference," *De Valle v. INS,* 901 F.2d 787, 792 (9th Cir. 1990), I would affirm the BIA's decision that Ms. Hartooni does not qualify for asylum.

The majority maintains that the IJ did not make findings on the credibility of Ms. Har-

tooni's claims because he did not "make findings of fact regarding which, if any, of her specific claims were questionable." Majority Opinion at 342. However, the IJ did state, after a detailed exposition of Ms. Hartooni's allegations of persecution, that "[t]he cumulative effect of the respondent's testimony and application therefore leads me to conclude that the respondent has not established a credible claim to persecution." IJ Opinion at 8–9. This conclusion establishes that the IJ did not find credible the petitioner's claim of fear of persecution based on the facts of her story. It is evident from the IJ's recitation of Ms. Hartooni's allegations of fear and her contradictory statements, that the IJ considered her story fully and found that conflicting facts destroyed the credibility of each of her claims of fear. Since the petitioner has not provided any explanation for the inconsistency of her statements, the only conclusion the IJ could draw was that her testimony was not credible. The IJ's conclusory statement should be enough. This court should not require that an IJ recite some talismanic rote on credibility to meet the burden.

The BIA did not err in according considerable deference to the IJ's conclusion on Ms. Hartooni's credibility since it was supported by substantial evidence. The facts that Ms. Hartooni's parents are practicing Christians living in Iran, that they run a successful business without any apparent government interference, and that they are allowed to send a considerable amount of money to their children living in the United States suggest that Ms. Hartooni could live safely with her parents in Iran. This is more than enough to support the BIA's determination that Ms. Hartooni did not qualify for asylum. *INS v. Elias–Zacarias,* — U.S. —, —, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992) (BIA's decision cannot be reversed unless petitioner presented such evidence that reasonable factfinder would have to conclude that requisite fear of persecution existed).

I respectfully dissent.